IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

LISA ASHCRAFT, et al.                                                    PLAINTIFFS

v.                                              CIVIL ACTION NO. 5:11cv176-DPJ-FKB

CITY OF VICKSBURG, et al.                                              DEFENDANTS

ORDER

This § 1983 case is before the Court on a number of dispositive motions:  Defendants

John Dolan, Victor Gray-Lewis, Troy Kimble, Paul Winfield, and Leonce Young's Motion for

Summary Judgment Based on Qualified Immunity [146]; Defendants Walter Armstrong, City of

Vicksburg, Dolan, Gray-Lewis, Kimble, Winfield, and Young's Motion for Summary Judgment

or, in the Alternative, Motion for Partial Summary Judgment [148]; Defendants Dolan, Gray-

Lewis, Kimble, Winfield, and Young's Motion to Dismiss and/or for Summary Judgment [171];

and Defendant Milton Moore's Motion to Dismiss Based on Qualified Immunity [192].

In general terms, Plaintiff Lisa Ashcraft and her son Isaiah claim that Defendants targeted

them for various forms of harassment in retaliation for Lisa Ashcraft's outspoken opposition to

then Mayor Paul Winfield.  They assert, for example, that local law enforcement singled them

out for arrest.  And while the evidence suggests that Winfield held a grudge, the Ashcrafts' own

actions created probable cause for the various traffic stops, and they have otherwise failed to

show that Defendants are not entitled to qualified immunity.  So as set forth below, the motions

for summary judgment and to dismiss are granted.

I.      Facts and Procedural History

Plaintiffs' conflict with the Defendants relates to various incidents occurring in

Vicksburg, Mississippi.  They began in April 2008 when American Corporation Investment

Group, LLC ("ACIG"), a business jointly owned by Plaintiff Lisa Ashcraft and her husband, purchased a building ("the Property") on Washington Street in downtown Vicksburg.  Ms. Ashcraft planned to renovate and develop the building as a mixed-use property including apartments and a bakery.

In 2006—before ACIG's purchase of the Property—several nearby buildings collapsed, including an adjacent building.  On June 16, 2008, the City of Vicksburg entered into an Agreed Order with the owners of the collapsed buildings regarding the demolition work to be performed.  Agreed Order [174-4].  Pursuant to that order, one of the property owners would "hire a structural engineer to develop a plan to safely dismantle" the collapsed buildings.  *Id.* ¶ 1.  The order required the plan to "address . . . the safety precautions for adjacent properties . . . and measures to assure that all adjacent properties are water tight after demolition . . . ."  *Id.*  The order contemplated that the plan would be submitted to the City of Vicksburg, which would issue demolition permits "if the plan appears to meet all conditions set forth above."  *Id.* ¶ 2.  Thereafter, Vicksburg's then Mayor Laurence Leyens, accompanied by Defendant Gray-Lewis, the City's Director of Building and Planning, "assured [Ms. Ashcraft] that the common wall of [the Property] and 707 Clay Street would be protected by being waterproofed, filled, and capped . . . ."  Leyens Aff. [174-5] ¶ 3; *see* R. Ashcraft Aff. [174-6] ¶ 2.

In spring and summer 2009, Ms. Ashcraft supported Leyens's reelection campaign by placing signs on the Property and appearing in an advertisement.  L. Ashcraft Dep. [174-2] at 99.  But Defendant Paul Winfield defeated Leyens in the mayoral race and took office in July 2009.  Shortly thereafter, Ms. Ashcraft began making other public statements adverse to Winfield.

2

By February 2010, the demolition project addressed in the 2008 Agreed Order was underway, and the contractor was removing a brick wall that the Property shared with a building under demolition.  When the contractor punctured that common wall, Ms. Ashcraft contacted Gray-Lewis, who issued a Stop-Work Order temporarily ceasing work until the contractor "rectifi[ed] and stopp[ed] the flow of water" caused by the breach in the common wall.  Stop-Work Order [174-9] ¶ 3.  Gray-Lewis suggested to the contractor that a Visqueen tarp would suffice to make the Property watertight, the contractor put a tarp in place, and Gray-Lewis lifted the Stop-Work Order.  Ultimately, the entire wall was destroyed in what Ms. Ashcraft describes as a retaliatory act.

Following the destruction of the common wall, Ms. Ashcraft sought the assistance of the Vicksburg Police Department with regard to the demolition.  She told the officer who arrived on the scene that she "wanted everyone arrested."  Vicksburg Police Department Narrative [174-14].  The officer contacted Gray-Lewis, who "told [him] this was Ashcraft's problem and that the wall torn down was court ordered and does not belong to Ashcraft," so the responding officer "left the situation alone."  *Id.*  Ms. Ashcraft thereafter initiated state-court proceedings regarding the wall that appear to remain pending at this time.

Another conflict between Plaintiffs and the Defendants began when Ms. Ashcraft started making a number of FOIA requests directed to the City Clerk, and Winfield's then chief of staff, Kenya Burks, testified that Winfield "complained about" Ms. Ashcraft's information requests.  Burks Dep. [174-11] at 29–30.  According to Burks, Winfield began referring to Ms. Ashcraft as "[t]hat old bitch" and believed that her FOIA requests were "driven by her political affiliation with Laurence Leyens."  *Id.* at 33.  Burks testified that Winfield announced his intent to have

3

Defendant John Dolan, the City's Deputy Police Chief, ticket Ms. Ashcraft for having a Florida tag on her vehicle. Burks Dep. [174-11] at 40–41. An arrest followed on March 3, 2011, and Dolan issued Ms. Ashcraft two traffic tickets: one for an illegal driver's license and one for an illegal tag. Traffic Tickets [174-20]. Ms. Ashcraft was ultimately found not guilty of those charges. Order [174-21].

Yet another conflict involved Ms. Ashcraft's adult son, Isaiah. Isaiah had a fledgling police-car restoration business in which he sold fully-equipped police cars to law-enforcement agencies. I. Ashcraft Dep. [174-24] at 8–9. On June 13, 2011, Isaiah was driving such a vehicle when Defendant Officer Troy Kimble pulled him over on suspicion of impersonating a police officer. Kimble Dep. [146-14] at 48. During the stop, Isaiah was unable to produce his driver's license or Social Security number, so Kimble followed him to the police station for further questioning. *Id.* at 77–78. Ms. Ashcraft met them at the station and produced Isaiah's Social Security number, L. Ashcraft Dep. [146-2] at 119, but Kimble then discovered that Isaiah's driver's license was suspended so he issued Isaiah a traffic citation and allowed him to leave. Kimble Dep. [146-14] at 88–89.

Defendant Officer Young had a similar encounter with Isaiah. Upon returning from active military duty, Young was informed by other officers that there had been "some vehicles with people riding around claiming to be police officers." Young Dep. [146-18] at 28–29. On August 15, 2011, Young spotted Isaiah driving a police vehicle with a radar device visible on the dashboard. He then pulled Isaiah over, approached the vehicle, and asked Isaiah for his driver's license. *Id.* at 37–38. Once again Isaiah could not produce a driver's license, nor could he produce proof of insurance. I. Ashcraft Dep. [146-3] at 64; *see* I. Ashcraft Video Recording

[174-26].  And when Isaiah gave Young his Social Security number, Young incorrectly conveyed the number to dispatch and was informed that it was invalid.  I. Ashcraft Dep. [146-3] at 66.  Isaiah was arrested for having no driver's license or proof of insurance.  Transcript [146-18 at Ex. 1] at 6.

Isaiah's final run in with the police occurred after this suit was filed.  On January 28, 2013, Defendant Officer Milton Moore pulled Isaiah over for speeding.  Am. Compl. [161] ¶ 43.  Plaintiffs allege that Moore arrested Isaiah on the speeding violation, handcuffed him, and took him to jail, where Isaiah was booked and detained.  *Id.*  Plaintiffs allege that Isaiah was released after posting bond.  *Id.*

Plaintiffs Lisa and Isaiah Ashcraft filed this lawsuit on December 19, 2011.  Compl. [1].  In it, they assert a number of claims under 42 U.S.C. § 1983:  First Amendment retaliation; First Amendment restraint of free speech; Fourth Amendment unreasonable detention and harassment; failure to train and supervise; retaliation under some unspecified constitutional provision for filing a lawsuit; and Fourteenth Amendment class of one equal protection.  Am. Compl. [161].

At the close of discovery, Armstrong, Dolan, Gray-Lewis, Kimble, Winfield, and Young, in their individual capacities, filed their Motion for Summary Judgment Based on Qualified Immunity [146], and all the originally-named Defendants filed a Motion for Summary Judgment or, in the Alternative, Motion for Partial Summary Judgment [148].  After Plaintiffs filed the Amended Complaint, Defendants re-urged their dispositive motions [171].  Having been served with the Amended Complaint, Defendant Moore, in his individual capacity, filed his Motion to Dismiss Based on Qualified Immunity [192].  The parties filed responses and replies, and the Court has personal and subject-matter jurisdiction and is prepared to rule.

II.     Standards

    A.      Rule 56

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure

when evidence reveals no genuine dispute regarding any material fact and that the moving party

is entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment,

after adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

    The party moving for summary judgment "bears the initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of [the record] which it

believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The

nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing

that there is a genuine issue for trial.'"  *Id.* at 324 (citation omitted).  Conclusory allegations,

speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute

for specific facts showing a genuine issue for trial.  *TIG Ins. Co. v. Sedgwick James of Wash.*,

276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)

(en banc); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).  In reviewing the evidence, factual

controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have

submitted evidence of contradictory facts."  *Little*, 37 F.3d at 1075.  When such contradictory

facts exist, the court may "not make credibility determinations or weigh the evidence."  *Reeves v.

Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted).

6

B.      Rule 12(b)(6)

Because Moore challenges the sufficiency of the allegations against him in the Amended

Complaint, his motion arises under Rule 12(b)(6).  In considering a motion under Rule 12(b)(6),

the "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the

plaintiff.'"  *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir.

2004) (quoting *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)).  However, "the tenet that

a court must accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions. Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell

Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  To overcome a Rule 12(b)(6) motion, a

plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."

*Twombly*, 550 U.S. at 570.  "Factual allegations must be enough to raise a right to relief above

the speculative level, on the assumption that all the allegations in the complaint are true (even if

doubtful in fact)."  *Id.* at 555 (citations and footnote omitted).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The Supreme Court's examination of the issue in *Iqbal* provides a framework for

examining the sufficiency of a complaint.  First, the district court may "begin by identifying

pleadings that, because they are no more than conclusions, are not entitled to the assumption of

truth."  *Id*. at 679.  Second, "[w]hen there are well-pleaded factual allegations, a court should

assume their veracity and then determine whether they plausibly give rise to an entitlement to

relief."  *Id*.

7

III.     Analysis

    A.     Qualified Immunity

        1.     Dolan, Gray-Lewis, Young, Kimble, and Winfield's Motion for Summary Judgment

Defendants Dolan, Gray-Lewis, Kimble, Winfield, and Young seek qualified immunity on the claims brought against them in their individual capacities.  Qualified immunity is a shield from individual liability for "'government officials performing discretionary functions . . . as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'"  *Good v. Curtis*, 601 F.3d 393, 400 (5th Cir. 2010) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).  "[Q]ualified immunity generally protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  It is "an entitlement not to stand trial or face the other burdens of litigation."  *Austin v. Johnson*, 328 F.3d 204, 207 (5th Cir. 2003) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

Courts deciding qualified immunity employ a two-part test.  *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005).  First, the plaintiff "must claim that the defendants committed a constitutional violation under current law."  *Id.* (citing *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *Palmer v. Johnson*, 193 F.3d 346, 351 (5th Cir. 1999)).  Second, the plaintiff "must claim that the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of."  *Id.*  "The defendant's acts are held to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or

the federal statute as alleged by the plaintiff." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457
(5th Cir. 2001).  Thus, "[a]n official is eligible for qualified immunity even if the official violated
another's constitutional rights," as long as the conduct was not objectively unreasonable.  *Id*.
Whether the conduct was objectively unreasonable is an issue of law reserved for the court.
*Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999).  Finally, the Court should "examine each
individual defendant's entitlement to qualified immunity separately." *Jacobs v. W. Feliciana
Sheriff's Dept.*, 228 F.3d 388, 395 (5th Cir. 2000) (citing *Stewart v. Murphy*, 174 F.3d 530, 537
(5th Cir. 1999)).

> a.    John Dolan

Plaintiffs appear to argue that Dolan's March 3, 2011 detention and citation of Ms.
Ashcraft violated her rights under the First and Fourth Amendments because his actions "were
not based on the existence of probable cause but were instead based on a directive from Mayor
Paul Winfield that had its genesis in Ms. Ashcraft's politically protected activities rather than her
alleged criminal conduct." Pls.' Mem. [177] at 13.  But because the evidence does not establish
that Dolan's actions violated Ms. Ashcraft's constitutional rights, Plaintiffs do not surpass the
first part of the qualified-immunity test, and Dolan is entitled to summary judgment.

There is no question that when Dolan pulled Ms. Ashcraft over on March 3, 2011, a
seizure within the meaning of the Fourth Amendment occurred.  *Brendlin v. California*, 551 U.S.
249, 255 (2007).  Whether that seizure was constitutionally valid is determined under the
standards announced in *Terry v. Ohio*, 392 U.S. 1, 88 (1968).  Under *Terry*, such a seizure is not
unreasonable under the Fourth Amendment if the detaining officer has "a reasonable and
articulable suspicion that a person has committed a crime." *United States v. Jenson*, 462 F.3d

399, 403 (5th Cir. 2006) (quoting *United States v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002)).

The Court employs "a two-part test to determine whether there was 'reasonable suspicion':

whether the officer's action was justified at its inception, and whether the officer's subsequent

actions were reasonably related in scope to the circumstances that justified the stop." *Id*. (citing

*Terry*, 392 U.S. at 19–20) (other citations and punctuation omitted).

"[T]he facts giving rise to reasonable suspicion must be judged against an objective

standard." *United States v. Ibarra-Sanchez*, 199 F.3d 753, 758 (5th Cir. 1999) (citation and

quotation omitted); *see also Swindle v. Livingston Parish Sch. Bd.*, 655 F.3d 386, 401 (5th Cir.

2011) ( "[W]e perform an objective analysis of the reasonableness of the official's conduct in

light of the circumstances and are forbidden from considering the official's subjective state of

mind." (internal quotation marks omitted)).  So long as a defendant "reasonably but mistaken

conclude[s]" that probable cause or a reasonable suspicion is present, he is entitled to qualified

immunity on a plaintiff's Fourth Amendment claim.  *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181,

207 (5th Cir. 2009) (quoting *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000)).

Here, Dolan had a reasonable and articulable suspicion that Ms. Ashcraft was violating

Mississippi law requiring residents to obtain Mississippi driver's licenses and license plates.[1]

---

[1]*See* Miss. Code Ann. § 63-1-5 (requiring persons operating motor vehicles on Mississippi roads to have "an operator's license to drive on the highways of the state"); *id.* § 63-1-7 (exempting from this requirement "nonresident person[s]" with valid licences from the state of their residence); *id.* § 27-19-63 (governing issuance of tags and explaining that a nonresident with a valid tag from that state of his residence who "brings such vehicle into the State of Mississippi for use in connection with his business in this state . . . shall be entitled to operate such vehicle without obtaining a privilege license in this state for a period of not more than thirty (30) days" and defining a resident as "[a]ny person who engages in a trade, profession or occupation in this state"); *id.* § 27-19-131 (making it a misdemeanor crime to operate a vehicle in Mississippi without having a Mississippi tag as required by law).

Dolan testified that Ms. Ashcraft appeared to reside in Vicksburg where she "operated a hot dog stand next to where she supposedly lived." Dolan Dep. [174-22] at 36. He was also familiar with Plaintiff from her appearances before the city board. *Id.* at 37. Yet she drove a vehicle with a Florida tag. When stopped, Ms. Ashcraft was unable to produce a Mississippi driver's license, thus giving Dolan "arguable probable cause" to issue the two citations. *Mendenhall*, 213 F.3d at 231. There are no material fact questions for a jury regarding this stop, and whether probable cause exists is a question of law. *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000). Dolan is entitled to qualified immunity on the Fourth Amendment claim.

Plaintiffs also suggest that Dolan stopped Ms. Ashcraft because she exercised her First Amendment rights. And they have offered competent record evidence that then Mayor Winfield intentionally harassed Ms. Ashcraft due to her protected speech, going so far as to tell his chief of staff that Dolan "was supposed to catch that bitch Lisa Aschraft with her Florida tags." Burks Dep. [174-11] at 74. If proven true, then the actions of then Mayor Winfield would be reprehensible. But the Ashcrafts must prove more than Winfield's alleged retaliatory animus to prevail.

"[T]he First Amendment is violated in 'ordinary citizen' cases if the individual engaged in conduct protected by the First Amendment and the government took action against the person because of that protected conduct." *Kinney v. Weaver*, 367 F.3d 337, 358 (5th Cir. 2004) (citation omitted). But as the Supreme Court stated in *Reichle v. Howards*, "[t]his Court has never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause; nor was such a right otherwise clearly established at the time of [the] arrest." 132 S. Ct. 2088, 2093 (2012). The Fifth Circuit reached that same conclusion in *Keenan v.*

*Tejeda* explaining that, in a case where the alleged retaliation took the form of a Fourth

Amendment seizure, "[i]f probable cause existed, . . . or if reasonable police officers could

believe probable cause existed," the officers are entitled to qualified immunity on the First

Amendment claim.  290 F.3d 252, 262 (5th Cir. 2002).  For the reasons set forth above, this is

precisely such a case.  Dolan is entitled to qualified immunity, and the claims against him in his

individual capacity are dismissed.

> b.    Victor Gray-Lewis

Ms. Ashcraft appears to assert a First Amendment retaliation claim against Gray-Lewis

stemming from his refusal "to prevent [the demolition contractor's] complete destruction of her

wall" and his action in "direct[ing] two Vicksburg Police Officers to ignore Ms. Ashcraft's

requests to cite [the contractor's] workers for criminal trespass despite their entry into the

exposed room on the other side of the now removed common wall."  Pls.' Mem. [177] at 13–14.

The Court concludes that Plaintiffs have failed to show that Gray-Lewis's conduct violated Ms.

Ashcraft's First Amendment rights, and he is therefore entitled to qualified immunity.

To establish that Gray-Lewis retaliated against Ms. Ashcraft in violation of the First

Amendment, Plaintiffs "must show that (1) they were engaged in constitutionally protected

activity, (2) [Gray-Lewis] caused them to suffer an injury that would chill a person of ordinary

firmness from continuing to engage in that activity, and (3) the defendant's adverse actions were

substantially motivated [by] the plaintiffs' exercise of constitutionally protected conduct."

*Keenan*, 290 F.3d at 259.  In a case like this, where the government official's motivation is an

element of the plaintiff's constitutional claim, the plaintiff "must identify affirmative evidence

from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

Plaintiffs satisfy some of these elements. There is no dispute, for example, that Ms. Ashcraft engaged in speech when she openly supported the former mayor. And the Court assumes without deciding that a jury question exists regarding the chilling effect of destroying the common wall between Plaintiffs' property and the property that was being demolished. Plaintiffs' claim fails, however, on the third element of the prima facie case—whether the actions were "substantially motivated" by the exercise of protected speech.

Having reviewed the record evidence the Ashcrafts cite, there is no evidence that Gray-Lewis held any retaliatory animus. Plaintiffs rely heavily on the deposition of Kenya Burks, who testified that Gray-Lewis discussed the Stop-Work Order with Mayor Winfield, but this was before the FOIA request that preceded Winfield's derogatory statements about Ms. Ashcraft and his desire to have her arrested. In any event, Burks's testimony stops well short of stating that Winfield instructed Gray-Lewis with respect to the work or that Gray-Lewis held any retaliatory animus that "substantially motivated" his actions. Plaintiffs' failure "to set forth any evidence of improper intent with respect to" Gray-Lewis entitles Gray-Lewis to qualified immunity. *Gerhart v. Hayes*, 217 F.3d 320, 322 (5th Cir. 2000).

The other argument Plaintiffs intimate in their fact section is that Gray-Lewis changed course with respect to the common wall. They state that he initially reassured them that the wall would be protected and even issued the Stop-Work Order only to lift it and allow demolition after meeting with Winfield. But the record does not support the inference that Gray-Lewis changed his mind or did so for retaliatory purposes.

To begin, the record in this case does not indicate that Plaintiffs had a legal right to the wall or that Gray-Lewis thought they did.  Viewed in a light most favorable to the Ashcrafts, Gray-Lewis attended a meeting during which former Mayor Leyens said the wall would be protected, but there is no evidence that Gray-Lewis held or expressed that view.  Instead, the record shows that during a 2006 hearing—long before Ms. Ashcraft engaged in protected speech—Gray-Lewis testified that he was concerned about the way the common wall would be removed.  Gray-Lewis agreed when asked in his deposition in this case that "it was [his] expressed concern [in the 2006 hearing] that care be taken to protect 1221 Washington Street with regard to *removal* of that as you called it a common wall [__]?"  Gray-Lewis Dep. [189-1] at 45 (emphasis added).  As a result of that concern, an order was entered in 2008 by the Circuit Court of Warren County, Mississippi, requiring that "all adjacent properties are water tight after demolition . . . ."  Agreed Order [174-4].  The Order does not specify whether the common wall would be retained, the demolition plan is not in the record, and Plaintiffs have not shown that they held a right to the wall or that Gray-Lewis believed they did.

The record likewise fails to support Plaintiffs' claim that Gray-Lewis stopped the demolition of the wall but then changed his mind and allowed it.  When the demolition created a hole that was not "water tight," Gray-Lewis entered the Stop-Work Order.  Gray-Lewis Dep. [189-1] at 89.  Contrary to Plaintiffs' characterization, the Stop-Work Order did not state that the wall could not be removed.  Instead, it stated that work must cease until the contractor "rectifi[ed] and stopp[ed] the flow of water" caused by the breach in the common wall.  Stop-Work Order [174-9] ¶ 3.  There is no dispute that this intent was conveyed to the contractor.  Greenwood Dep. [176-13] at 80.  According to Gray-Lewis, his actions were consistent with his

14

interpretation of the court order.  *See* Gray-Lewis Dep. [189-1] at 89–92.  Finally, even if Gray-Lewis was mistaken in his understanding, a simple mistake or even negligence would not violate a clearly-established constitutional right.

        c.        Leonce Young and Troy Kimble

Plaintiffs allege Fourth, First, and Fourteenth Amendment claims against Defendants Kimble and Young arising out of the August 15, 2011 detention and arrest of Isaiah.  Pls.' Mem. [177] at 15.  They assert that the seizure was unreasonable in violation of Isaiah's Fourth Amendment rights, was in retaliation for Ms. Ashcraft's exercise of free speech in violation of her First Amendment rights, and violated Isaiah's Fourteenth Amendment right to equal protection.  Each officer's conduct with respect to the events of August 15, 2011, will be considered separately.

        i.        Leonce Young

As with Dolan's stop of Ms. Ashcraft, Young's initial stop of Isaiah was supported by a reasonable and articulable suspicion that Isaiah had committed a crime, namely, impersonating a police officer.  *See* Miss. Code Ann. § 97-7-43 (making it a misdemeanor to impersonate a state officer or employee).  Specifically, Young had been informed that an individual was impersonating a police officer and he saw Isaiah driving a police vehicle, so he pulled Isaiah over to verify his identity.  *See* Young Dep. [146-18] at 59.  There was an objectively reasonable and articulable suspicion to support the stop.[2]

---

[2]Isaiah recalls some testimony in which Young discounted the possibility that someone was impersonating an officer.  But Young learned of this report from other officers who told him to "be on the lookout."  Young Dep. [146-18] at 28.  He then saw Isaiah, who was not an officer, in a police vehicle.  And more to the point, Young's state of mind is not the issue; the Court must review the evidence objectively.  *Ibarra-Sanchez*, 199 F.3d at 758.

Plaintiffs attempt to refute this suspicion by correctly noting that section 97-7-43 precludes impersonating a Mississippi officer and that the subject vehicle had an Arkansas license plate.  They conclude therefore that Young lacked reasonable suspicion for the initial stop.  But the fact that this particular vehicle displayed an Arkansas plate on its back does not defeat qualified immunity.

First, Young testified that there were reports of more than one vehicle being involved.  Young Dep. [146-18] at 28.  Seeing someone who is obviously not an officer driving a patrol car gives reasonable suspicion that the driver might be involved.  Second, even if the plates on the back of the car were from Arkansas, that would not necessarily satisfy section 97-7-43.  There is no dispute that the car was, as Isaiah described it, a "police vehicle."  *See* Transcript [146-18 at Ex. 1] at 31.  And according to Young, he was told by other officers to "be on the lookout [for] vehicles with people riding around claiming to be police officers."  Young Dep. [146-1] at 28.  The officers also informed Young that "somebody on Highway 80 [was] pulling people over and speeding with their lights on and stuff like that."  *Id.*; *see also id.* at 33 ("Just saying a car supposed to be running with lights and–and sirens and stuff like that, that is not a police officer.").  A driver who is pulled over by a police vehicle running with lights and siren would believe a Mississippi officer was involved unless they happened to see the tag on the back of vehicle.  So while the Arkansas tag would be relevant to a charge under this statute, it does not preclude a reasonable suspicion that the driver was attempting to impersonate a Mississippi officer.  Finally, even under a probable cause standard, "law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citation and quotations omitted).

16

Plaintiffs next contend that even assuming a valid stop, Young exceeded his constitutional license when he continued the investigation.  Once a valid investigatory stop is made, the officer's conduct is judged by whether his "subsequent actions were reasonably related in scope to the circumstances that justified the stop."  *Jenson*, 462 F.3d at 403 (quoting *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004)).  Detention in an investigatory stop "may last no longer than required to effect the purpose of the stop."  *Id.* at 404 (citation omitted).  But "if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed."  *Id.* (quoting *United States v. Lopez–Moreno*, 420 F.3d 420, 431 (5th Cir. 2005)).  Significantly, there is

> no constitutional impediment to a law enforcement officer's request to examine a driver's license and vehicle registration or rental papers during a traffic stop and to run a computer check on both. . . .  Such questions may efficiently determine whether a traffic violation has taken place, and if so, whether a citation or warning should be issued or an arrest made.

*United States v. Brigham*, 382 F.3d at 507–08 (citation omitted).

In this case, Plaintiffs characterize Young as having asked for photo identification and basing the arrest on Isaiah's failure to produce it.  While there are cases stating that qualified immunity will not protect an officer who arrests a plaintiff for failing to produce photo identification, the facts of this case are different as demonstrated by the transcript of the recording made during the stop.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that no reasonable jury could believe party's account because it contradicted surveillance video).

When Young stopped Isaiah's car, the first question he asked was whether Isaiah had a driver's license.  Transcript [146-18 at Ex. 1] at 31.  There is no constitutional impediment to

17

that request.  *Brigham*, 382 F.3d at 507–08.  And Isaiah's failure to produce a license provided additional reasonable suspicion to continue the stop.  *See* Miss. Code Ann. §§ 63-1-5 ("No person shall drive or operate a motor vehicle . . . upon the highways of the State of Mississippi without first securing an operator's license . . . .") and 63-1-41 ("Every licensee shall have the required license in his immediate possession at all times when operating a motor vehicle and shall display the same, upon demand of . . . a peace officer.").

When Isaiah failed to produce a valid driver's license, Young called the license number into the station as *Terry* permits.  *Jenson*, 462 F.3d at 404 (noting that an officer "may run a computer check on" the driver's license number).  There is no dispute that after Young misquoted the number, he was informed that it was invalid.  Plaintiffs do not suggest that the mistake was intentional, and being informed that the number was invalid created more reasonable suspicion.  And finally, Isaiah was unable to produce proof of insurance creating reasonable suspicion that he was violating Mississippi Code section 63-15-4(2)(a) (requiring proof of insurance).  Transcript [146-18 at Ex. 1] at 36.

The final question is whether the arrest itself was constitutionally sound.  It is again important to start with the actual basis of the arrest.  Looking to the transcript from the stop, Young clearly informs Isaiah that he is being arrested "because right now you don't have a driver's license, you don't have proof of insurance on the vehicle."  Transcript [146-18 at Ex. 1] at 36.  Young makes similar comments throughout the stop.  *See, e.g.*, *id.* at 34–35.

At that point, arguable probable cause existed to believe that Isaiah was operating a motor vehicle in violation of two Mississippi Code sections.  *See* Miss. Code Ann. §§ 63-1-5, 63-1-7. That arguable probable cause justified his arrest.  *Atwater v. City of Lago Vista*, 532 U.S. 318,

354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").  Plaintiffs have not established that Young violated Isaiah's Fourth Amendment rights, and even if he did, they fail to show that the arrest was objectively unreasonable.  Young is entitled to qualified immunity on the Fourth Amendment claim.

As for the First Amendment claim against Young, it fails for the same reasons Plaintiffs could not establish that claim against Dolan.  *See Keenan*, 290 F.3d at 262 ("If probable cause existed, however, or if reasonable police officers could believe probable cause existed, they are exonerated [on the First Amendment claim]").  Plus, there is no evidence that Young held any retaliatory animus or was substantially motivated by Ms. Ashcraft's speech.  Young is entitled to qualified immunity on the First Amendment claim.

Finally, Plaintiffs assert that Young violated Isaiah's Fourteenth Amendment right to equal protection by "singl[ing] him out [and] treating him unequal and different to identically situated individuals in that [Young] ha[s] never placed other citizens under custodial arrest and shackled them in jail for simply failing to have proof of insurance."[3]  Am. Compl. [161] ¶ 81.  A class-of-one equal-protection claim will lie "where the plaintiff [shows] that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  Plaintiffs have not made this showing.

---

[3]After Isaiah provided proof that he held a valid Florida license, he received a ticket for lack of proof of insurance, but the initial arrest also included the lack of a driver's license.

Plaintiffs argue that Young is not entitled to qualified immunity on the equal-protection claim because *Young* has not proven that similarly-situated drivers were treated the same.  But as Defendants note in reply, the Ashcrafts have the burden of disproving qualified immunity and the burden to respond with competent summary-judgment evidence under Rule 56(c).  The evidence they provide fails to meet these burdens.

Plaintiffs first cite paragraph 78 of the Complaint.  Pls.' Mem. [178] at 24.  But nonmovants like the Ashcrafts must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp.*, 477 U.S. at 324.  Next, Plaintiffs cite the City of Vicksburg's Response to Plaintiffs' First Request for Admissions.  Pls.' Resp. [174] Ex. 34.  Response to Request for Admission No. 3 states that the city has no record of any individuals, including Isaiah, being arrested "for the sole charge of no insurance."  *Id*. at Resp. No. 3.  Even assuming this admission proves that Vicksburg officers have faced substantially-similar circumstance and failed to arrest those individuals—which is not apparent—the evidence says nothing of the claim against Young.  As stated above, Isaiah must prove that Young "intentionally treated [him] differently" from others with no "rational basis for the difference in treatment."  *Village of Willowbrook*, 528 U.S. at 564.  The record evidence fails to establish that Young himself ever gave more favorable treatment to a driver who presented no license and no proof of insurance, that he did so intentionally, or that there was no rational basis for the different treatment.  Young is entitled to summary judgment on the equal-protection claim.

ii.     Troy Kimble

Plaintiffs assert that Kimble "violated [Isaiah's] established Fourth Amendment rights" through "Kimble's arrest of [Isaiah] for failing to have a sufficient 'form of ID.'"  Pls.' Mem.

[177] at 17.  As an initial matter, there is nothing to suggest that Kimble—rather than

Young—arrested Isaiah on August 15, 2011.  It also appears that Kimble arrived late to the scene

and after Young had established the lack of a driver's license or proof of insurance.  *See* L.

Ashcraft Dep. [176-2] at 126.  Even if Kimble had arrested Isaiah, however, for the reasons

discussed with respect to Young above, Kimble would be entitled to qualified immunity on all

Plaintiffs' claims arising out of his involvement in the August 15, 2011 traffic stop and arrest.

> d.      Paul Winfield

Plaintiffs assert that Winfield violated Ms. Ashcraft's First and Fourth Amendment rights

by "hav[ing] Ms. Ashcraft detained, cited and prosecuted for the purpose of fulfilling his own

politically motivated vendetta."  Pls.' Mem. [177] at 12.  Assuming Plaintiffs' theory is based on

Winfield's personal actions and not *respondeat superior* liability, the Court has already

concluded that Dolan's detention and citation of Ms. Ashcraft withstand constitutional scrutiny.

And Plaintiffs have pointed to no evidence linking Winfield to any other alleged constitutional

violations.  Winfield is therefore entitled to qualified immunity.

> 2.      Moore's Motion to Dismiss

Plaintiffs assert claims against Defendant Officer Moore under the First and Fourteenth

Amendment arising out of his January 28, 2013 traffic stop of Isaiah.  As to that event, the

Amended Complaint explains:

> On January 28, 2013, Defendant Moore pulled Isaiah Ashcraft over for allegedly
> speeding.  Defendant Moore arrested Mr. Ashcraft, put him in handcuffs and took
> him to jail, where Mr. Ashcraft was booked and placed in jail.  Mr. Ashcraft was
> later released after posting bond and was only charged with speeding.

Am. Compl. [161] ¶ 43.  Plaintiffs allege that the January 28, 2013 arrest of Isaiah "arose out of an unlawful intent to retaliate against Ms. Ashcraft" under the First Amendment and violated Isaiah's Fourteenth Amendment right to equal protection.  *Id.* ¶¶ 62, 82.

Moore asserts he is entitled to qualified immunity on the claims asserted against him in his individual capacity because the Amended Complaint contains no factual allegations that "establish a connection between" Moore's stop of Isaiah and Winfield's alleged animus or that Moore intentionally treated Isaiah differently than similarly-situated individuals.  Defs.' Reply [198] at 4, 7–8.  Moore thus identifies pleading deficiencies that he says entitles him to dismissal.[4]

The Court agrees with Moore that Plaintiffs' allegations against him consist largely of legal conclusions rather than well-pleaded facts that establish Plaintiffs' right to relief over a qualified-immunity motion.  But, given the procedural posture of the claims against Moore, the Court will allow Plaintiffs an opportunity to amend as to the claims arising out of the January 28, 2013 traffic stop.  *See Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000).

---

[4]Moore also attempts to rebut Plaintiffs' arguments by submitting, along with his reply memorandum, records purportedly refuting Plaintiffs' allegation that the City did not arrest others for speeding only.  Speeding-Only Arrest Documents [198-1].  This evidence is not properly before the Court on Moore's Rule 12(b)(6) motion.  *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).  Moreover, absent an opportunity for Plaintiffs to respond, the Court is reluctant to consider evidence submitted with Moore's reply.  *See Vais Arms, Inc. v. Vais*, 383 F.3d 287, 292 (5th Cir. 2004).  Finally, the evidence does not appear to be related to only arrests made by Moore, as opposed to other officers.

B.      Motion for Summary Judgment

      1.      Municipal Liability

The City of Vicksburg, along with Winfield, Gray-Lewis, Armstrong, Dolan, Kimble, and

Young in their official capacities (collectively, "the City"), have also moved for summary

judgment on the remaining claims.  As set forth above, Plaintiffs have not established that any

constitutional violations occurred.  Absent "an underlying constitutional violation, an essential

element of municipal liability is missing."  *Becerra v. Asher*, 105 F.3d 1042, 1048 (5th Cir.

1997) (quoted in *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 867

(5th Cir. 2012)).  Therefore, the claims against the City will be dismissed.  The dismissal will be

without prejudice as to the claims arising out of Moore's January 28, 2013 arrest of Isaiah.

      2.      Failure to Train

Plaintiffs argue that the City and Chief of Police Defendant Armstrong "may be liable for

[their] failure to train Officers Kimble and Young on the prerequisites for conducting a *Terry*

stop and the elements necessary for finding someone liable for violating Mississippi's police

impersonation statute or for criminal trespass . . . ."  Pls.' Mem. [178] at 23; *see Terry v. Ohio*,

392 U.S. 1 (1968).  To succeed on a failure-to-train theory of liability, "the plaintiff must show

that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link

exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3)

the failure to train or supervise amounts to deliberate indifference."  *Estate of Davis ex rel.*

*McCully v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (citations omitted).

"To satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of

violations and that the inadequacy of the training is 'obvious and obviously likely to result in a

constitutional violation.'"  *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003) (citing *Thompson*, 245 F.3d at 459).  In this case, Plaintiffs fail to demonstrate a constitutional violation regarding the various stops, so they have not met the second prong of the prima facie test.[5]

       3.    Damages

Defendants make the additional argument that they "are entitled to partial summary judgment at this time with respect to recoverable damages."  Defs.' Mem. [149] at 16.  Because the Court has ruled in Defendants' favor on the liability issues, it need not address damages.

IV.    Conclusion

The Court has considered all the parties' arguments.  Those not specifically addressed would not have changed the outcome.  For the foregoing reasons, Defendants' Motion for Summary Judgment Based on Qualified Immunity [146] is granted; Defendants' Motion for Summary Judgment or, in the Alternative, Motion for Partial Summary Judgment [148] is granted; Defendants' Motion to Dismiss and/or for Summary Judgment [171] is granted; and Defendant Milton Moore's Motion to Dismiss Based on Qualified Immunity [192] is granted. Plaintiffs' claims are all dismissed.  Plaintiffs, however, may file a Second Amended Complaint on or before July 8, 2013 restating their claims arising out of the January 28, 2013 traffic stop and arrest.  In the event Plaintiffs choose to file a Second Amended Complaint, the parties shall contact the magistrate judge's chambers to set the case for a status conference to establish

_____

[5]Even assuming they had such evidence, Plaintiffs still fail to satisfy the third prong—deliberate indifference.  *See Connick v. Thompson*,131 S. Ct. 1350, 1361 (2011) (noting that "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train").

deadlines for immunity-based discovery and motion practice.[6]  Plaintiffs' Daubert motion [92] is denied without prejudice.  Defendants' two motions for sanctions [144, 145] are denied.

  **SO ORDERED AND ADJUDGED** this the 24th day of June, 2013.

        s/ *Daniel P. Jordan III*
        UNITED STATES DISTRICT JUDGE

---

[6]If Plaintiffs do not file a Second Amended Complaint on or before July 8, 2013, a final judgment will be entered without further notice.